IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| LEIGH MCINVALE,<br><br>      Plaintiff,<br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>      Defendant. | Civil Action No.<br>5:07-CV-459-HL |

# ORDER

Plaintiff Leigh McInvale brings this action to recover long-term disability ("LTD") benefits under the GEICO Corporation Long Term Disability Plan (the "Plan"), an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Currently before the Court are Defendant's Motion for Trial on the Papers, or Alternatively for Summary Judgment, and Plaintiff's Motion for Summary Judgment.[1] The Court treats the Parties' Cross-Motions for Summary Judgment

---

[1] Defendant files its motion pursuant to Fed. R. Civ. P. 52(a), which provides, in pertinent part, that:
> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specifically and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed

1

as a Trial on the Papers pursuant to Fed. R. Civ. P. 52(a).[2]  Upon review of the claims file, other evidence submitted by the parties, the arguments of counsel, and the relevant legal authorities, the Court decides this case in favor of Defendant with the following Findings of Fact and Conclusions of Law.

I.  **FINDINGS OF FACT**

   A.  **The LTD Plan**

Plaintiff was insured under the Plan issued by Defendant Metropolitan Life Insurance Company ("MetLife") to her former employer, GEICO.  The Plan is insured and administered by MetLife.  The Plan provides, in pertinent part:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings

---

by the court.

[2] See Doyle v. Liberty Life Assurance Co., 542 F.3d 1352, 1363 n.5 (11th Cir. 2008) (explaining that when a decision is based on the agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law, not Fed. R. Civ. P. 56, to avoid an unnecessary step that could result in two appeals rather than one); see also Chilton v. Savannah Foods & Indus., Inc., 814 F.2d 620, 623 (11th Cir. 1987) (per curiam) (noting that the court, and not a jury, is the proper fact finder in an ERISA case).

        at your Own Occupation for any employer in your Local Economy; or

2.     after the 24 month period, you are unable to earn more than 80% of your indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

When making a benefits determination under the Plan, MetLife, as the administrator of the plan, had the discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits thereunder. Specifically, the Plan provided that:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for any entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

**B.**     **MetLife's Review of Plaintiff's Claim**

Plaintiff, a 53 year old female, worked at the national insurance company GEICO from January 1987 through March 2005.  Prior to leaving GEICO, Plaintiff worked as a salvage specialist, whose primary function was to manage policy holder claims from the time of initial reports through payment of loss and disposition of salvage.  According to her supervisor, the frequency of interpersonal relations necessary to perform the job was 98% and the frequency of stressful situations necessary to perform the job was 50%.  As stated by Plaintiff, her job was essentially clerical in nature and not high in stress.

On March 9, 2005, Plaintiff stopped working as a salvage specialist for GEICO due to bipolar disorder, hepatitis C, and major depression. Approximately four months later, on July 16, 2005, the Social Security Administration found Plaintiff disabled.  On August 6, 2005, Plaintiff filed a claim for LTD benefits under the Plan for bipolar disorder and hepatitis C.

By the end of October 2005, MetLife had received the following documentation from Plaintiff in support of her claim for LTD benefits: Plaintiff's Personal Profile Evaluation completed on October 1, 2005; reports from Dr. Nathan Feibelman III, M.D., a psychiatrist who treated Plaintiff in 2004 and 2005; reports from Phyllis Rohrbeck, LPC, Plaintiff's counselor since 2002; and reports from Dr. Carol Pryby, M.D., Plaintiff's family practice physician since 2002.

In Plaintiff's Personal Profile Evaluation, Plaintiff reported she had chronic hepatitis C and bipolar disorder, mixed, moderate to severe.  She reported that

4

she may never be able to return to work because she intermittently experiences disabling fatigue, nausea, depression, extreme anxiety, and periods of inability to focus and comprehend things, as if her "brain is wrapped in gauze." Plaintiff further indicated that no accommodations would permit her to return to work, opining that taking eight hours to accomplish three to four hours of work and missing an average of one day a week was unacceptable. Plaintiff stated that other manifestations of her conditions include taking hours to get up and going in the mornings and occasionally using her credit card profligately. She indicated that she could perform basic household duties when she was able, and occasionally engaged in activities such as walking, movies, reading, and television when her focus was good.

MetLife received from Dr. Feibelman his Initial Assessment and Evaluation dated November 30, 2004, and an Attending Physician's Statement ("APS") dated July 27, 2005. Dr. Feibelman reported in his Initial Assessment and Evaluation, that Plaintiff had a Global Assessment of Functioning ("GAF") score of 65, indicating some mild symptoms.[3] He described her symptoms as anxious and

---

[3] The Global Assessment of Functioning (GAF) scale is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. See Am. Psychiatry Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (hereinafter DSM-IV). A GAF score of 61 to 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functions (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal

dysphoric, significant mood swings, crying, hypo-manic periods, and depression. He concluded several diagnoses, including generalized anxiety disorder; bipolar disorder, mixed, moderate, possibly with psychotic features; borderline personality disorder; and, dependent personality disorder. No assessment for Plaintiff's ability to work was made in the Initial Assessment and Evaluation.

In his APS, Dr. Feibelman reported a diagnosis of severe bipolar disorder, with subjective symptoms of severe depression and anxiety. Dr. Feibelman indicated that Plaintiff's psychological functions imposed moderate limitations such that she is able to engage in only limited stress situations and engage in only limited interpersonal relations. He opined that Plaintiff could not work any hours per day due to her depressed state. Although Dr. Feibelman did not address Plaintiff's prognosis for returning to work, he stated her depression has prevented her form working thus far.

MetLife received from Ms. Rohrbeck MetLife's Behavioral Health Initial Functional Assessment Form dated September 24, 2005, and an APS completed on October 18, 2005. In the APS, Ms. Rohrbeck reported diagnoses of generalized anxiety disorder and bipolar disorder. She indicated in the Behavioral Health Initial Functional Assessment Form that Plaintiff had extreme inability to maintain appropriate control of emotions, to handle goals, objectives,

---

relationships." Id.

and performance measures, to maintain a work pace appropriate to workload, and to supervise others. Regarding Plaintiff's prognosis for work, Ms. Rohrbeck opined that Plaintiff had an extreme inability to function in most areas due to continuous impairment and could not perform work under any level of stress or demands. She stated that Plaintiff's prognosis for return to work, and reasonable accommodations for facilitate return to work, were unknown. However, Ms. Rohrbeck also reported Plaintiff had a GAF score of 65 on May 14, 2004, and a GAF score of 70 on September 24, 2005, both indicating some mild symptoms consistent with the GAF score assigned by Dr. Feibelman.

In his APS, Dr. Pryby reported diagnosis of chronic hepatitis C and chronically elevated liver enzymes. Dr. Pryby reported subjective symptoms of fatigue, aches, foggy feelings, and poor concentration. He opined that the effects of hepatitis C limited Plaintiff to engage in only limited stress situations and engage in only limited interpersonal relations. Dr. Pryby reported Plaintiff was physically capable of working only two hours per day because of chronic fatigue, myalgia, and poor concentration skills, yet also stated as a general prognosis that Plaintiff could return to work part-time, with restrictions from situations that are high stress or physically demanding.

Based on a review of this evidence, MetLife denied Plaintiff's claim for LTD benefits by letter dated October 31, 2005, stating:

> Ms. Rohrbeck notes a [GAF] score of 70 indicated only some mild

symptoms, but generally functioning pretty well.. . .

The level of functional impairment described by Ms. Rohrbeck on the form does not coincide with the [GAF] score she assigned and the method by which she assessed your ability to function is not noted. The same is true for the information in Dr. Feibelman's office visit notes.  There is no narrative description of any specific functional impairment resulting from your psychiatric condition recorded in any of the notes submitted.. . .

 Dr. Pryby documented that she did not advise you to cease working. Additionally, you informed MetLife that the large part of your disability was due to your bipolar disorder and you had not seen your Gastroenterologist since 2/2004, which was almost a year prior to the date you last worked.

 In conclusion, the medical documentation received and reviewed does not support an ongoing functional impairment due to a psychiatric or physical condition that would prevent you[] from performing the duties of your job as a salvage specialist.

Plaintiff appealed this decision and submitted additional medical records from Dr. Stephen Mallary, M.D., of The Psychiatric Center of Macon, Inc., and letters from Dr. Feibelman and Ms. Rohrbeck.  In his initial psychiatric evaluation dated March 16, 2004, Dr. Mallary diagnosed Plaintiff with major depression and opined that Plaintiff should consider psychiatric hospitalization should her condition worsen.  In response to MetLife's conclusion, Dr. Feibelman wrote a letter again opining that Plaintiff's depression was treatment resistant and has resulted in her being unable to work.  Dr. Rohrbeck also wrote a letter to MetLife explaining her reports, stating:

When I filled out the form for Mrs. Leigh McInvale on 9/21/05, I had

returned from a six-month sick leave. I had only seen her one time since my return. She reported at that time vast improvements in her home life relationships. When I left in May 2005, her home life was in chaos. It was on that basis that I marked she had some meaningful relationships. The home life has continued to show great improvements. However, Leigh's emotional state has not improved. She has extreme depressed episodes, has not responded well to medication, is willing to try VNS therapy and often talks of suicide. It is my opinion that Leigh could in no way hold down a job with any level of stress or responsibility.

In addition to reviewing the additional evidence submitted by Plaintiff, MetLife had Plaintiff's medical records reviewed by two independent physician consultants ("IPC"), both of whom opined that Plaintiff was not sufficiently impaired to prevent her from performing her job. Dr. James Brown, M.D., an IPC certified in internal medicine and gastroenterology, stated with regards to Plaintiff's level of functionality that:

> Her level of functionality and abilities would be strictly based on a psychiatric diagnosis. There is no gastrointestinal issue with her diagnosis of hepatitis C. This suggests that this is [not] causing any impairment/ Hepatitis C is generally asymptomatic except in advanced states, which she has no evidence of and we have no laboratory, or biopsy evidence of any severity of this disease.

Dr. Reginald Givens, an IPC in the field of Psychiatry, found that Plaintiff's history supported a diagnosis of bipolar disorder, but that "[a]ccording to the objective evidence in the medical records, there is insufficient objective evidence to support significant impairment that would prevent [Plaintiff] from performing occupational duties or other specific limitations regarding ability to function at

present from a psychiatric perspective or other specific restrictions due to safety issues. . ..." Specifically, Dr. Givens noted that Plaintiff's records "report intact memory and do not provide objective evidence concerning concentration and attention span or other cognitive dysfunction regarding specific testing on mental status exam or any other type of testing."

Morever, neither Dr. Brown nor Dr. Givens modified their findings after review of the letter in support of Plaintiff's initial appeal written by Ms. Rohrbeck.[4] Dr. Givens responded specifically to the explanation written by Ms. Rohrbeck by again stating there was insufficient objective evidence to support dysfunction.

On December 23, 2005, MetLife affirmed its decision to deny Plaintiff's claim for LTD benefits. On January 20, 2006, Plaintiff's attorney requested a additional appeal of MetLife's determination. Thereafter, on October 19, 2007, Plaintiff's attorney again requested an additional appeal, submitting in support thereof additional medical information.[5] MetLife responded by stating review of

---

[4] MetLife had not yet received Ms. Rohrbeck's letter at the time of the initial reviews; upon receipt, MetLife forwarded it to Dr. Brown and Dr. Givens for review.

[5] This additional evidence consisted of a psychological report from Dr. Christopher Tillitshi; medical records from Coliseum Psychiatric Center; a Mental Status Examination completed by Dr. Ahmadi; undated medical records and reports from Dr. Feiblman; and updated records from Dr. Pryby. This medical evidence was submitted after MetLife had made a final determination, however, and therefore can not be considered in reviewing it's decision. Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989).

Plaintiff's claim was completed as of December 23, 2005, and that no further appeals would be considered. Plaintiff subsequently filed this action asserting Defendant's decision to deny LTD benefits was wrong and unreasonable.

## II.  CONCLUSIONS OF LAW

### A.  ERISA Analytical Framework

The text of ERISA does not promulgate standards for the district court to apply when reviewing a plan administrator's decision to deny benefits. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S. Ct. 948 (1989). Filling this void, the Supreme Court in Firestone instructed courts to apply a *de novo* standard of review unless the benefits plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Id. at 115. Furthermore, when an administrator with discretion operates under a conflict of interest, "that interest my be weighed as a factor in determining whether there is an abuse of discretion." Id. (internal quotations omitted). The Eleventh Circuit has summarized this review process in five steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then

determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

Lee v. BellSouth Telecomms, Inc., 318 Fed. Appx 829, 835-36 (11th Cir. 2009) (citing Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004), *abrogated on other grounds by* Met. Life Ins. Co. v. Glenn, —U.S.—, 128 S. Ct. 2343 (2008)). Moreover, if there is a conflict of interest, then the reviewing court must consider the conflict as being a factor in determining whether the plan administrator has acted arbitrarily and capriciously. Met. Life Ins. Co., 128 S. Ct. at 2346; White v. Coca-Cola Co., 542 F.3d 848, 853-54 (11th Cir. 2008).

**B.    The Policy's Discretionary Language**

As discussed above, the Court must first determine the appropriate standard of review–*de novo* or arbitrary and capricious–, which turns on whether the Plan vested MetLife with discretionary authority. An "administrator is vested

with discretionary authority only if the plan instrument explicitly grants discretion to the administrator over specific activities." Culp v. Cain, 414 F. Supp. 2d 1118, 1124 (M.D. Ala. 2006) (citing Firestone, 489 U.S. at 112-13, 109 S. Ct. 984). Thus, the Court must look to the language of the Plan documents to determine whether a claims administrator is vested with the discretionary authority to make benefits-eligibility determinations so as to trigger an arbitrary and capricious standard of review. Here, the Plan documents provided, in pertinent part:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries *shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for any entitlement to Plan benefits in accordance with the terms of the Plan.* Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(emphasis added).

The Plan explicitly grants discretionary authority to MetLife to determine eligibility for benefits and to construe the terms of the Plan. See Jett, 980 F.2d at 1137 (holding that the arbitrary and capricious standard of review was applicable because the plan gave the administrator "the exclusive right to interpret the provisions . . . so its decision [was] conclusive and binding."); cf. Kirwan v.

Marriott Corp., 10 F.3d 784, 788-89 (11th Cir. 1994) (holding that the language of the plan fell short of the express grant of discretionary authority because there was no grant of authority to construe the terms of the plan.). Accordingly, the Court will review MetLife's decision to deny Plaintiff's claim for LTD benefits using the arbitrary and capricious standard.

### C. The Court Assumes the Denial Decision Was *De Novo* Wrong

"A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, the court disagrees with the administrator's decision." Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) (internal quotations omitted). Thus, the Court "must consider, based on the record before the administrator at the time [the] decision was made, whether [it] would reach the same decision as the administrator." Id. Here, the Court need not embark into an analysis of whether it disagrees with MetLife's decision from a *de novo* perspective; it is clear from the findings of fact that MetLife's decision was neither arbitrary nor capricious. Therefore, finding Defendant's decision was reasonable, the Court will assume *arguendo* that Defendant's decision was *de novo* wrong.

### D. Defendant's Decision Was Not an Abuse of Discretion

Assuming *arguendo* that Defendant's decision was *de novo* wrong, the Court finds that the denial was nevertheless reasonable and thus it was not an

14

abuse of discretion.  "In reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made." Buckly v. Metro. Life, 115 F.3d 936, 941 (11th Cir. 1997) (per curiam).  In other words, "[a]s long as a reasonable basis appears for [Defendant's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." White v. Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008) (quoting Jett, 890 F.2d at 1140.).

In this case, the Court finds that Defendant's benefit-denial decision was not unreasonable.  As an initial matter, the Court finds Defendant was not unreasonable in deciding that Plaintiff is not prevented from working due to her chronic hepatitis C.  Although Dr. Pryby opined Plaintiff could work only part-time, Dr. Brown, an IPC certified in internal medicine and gastroenterology, stated there were "no gastrointestinal issues with the Plaintiff's hepatitis C," which is typical as "hepatitis C is normally asymptomatic except in advanced states which [Plaintiff] has no evidence of and we have no laboratory, or biopsey evidence of any severity of this disease."  Based off this finding, Dr. Brown stated that any impairment with Plaintiff would be based strictly off a psychiatric, as opposed to hepatitis C, diagnosis.  These findings, moreover, are consistent with the fact Plaintiff had not seen a Gastroentrerologist for almost a year prior to the last day

she worked.  Finally, the Court finds it significant that when the Defendant reviewed Plaintiff's claim on appeal, Plaintiff had submitted updated reports for her bipolar disorder and depression from Drs. Mallary, Feibleman, and Ms. Rohrbeck, but did not submit any additional evidence to rebut Dr. Brown's determination.

The Court also finds it was not an abuse of discretion for Defendant to decide Plaintiff was not unable to perform her occupation due to the bipolar disorder or depression.  The Defendant based it's decision off several factors, including the inconsistency between the level of functional impairment described by Dr. Feibelman and Ms. Rohbeck versus the GAF scores assigned to Plaintiff, and the opinions of two IPC's.  Ms. Rohbeck, for instance, opined Plaintiff had an extreme inability to perform in most areas due to continuous impairment and could "in no way hold down a job with any level of stress or responsibility," yet simultaneously assigned a GAF score of 65 and 70, on May 14, 2004, and September 24, 2005, respectively.  Those GAF scores indicate only some mild symptoms, but generally functioning pretty well and capable of having some meaningful interpersonal relationships, which patently conflicts with the Ms. Rohbeck's conclusion that Plaintiff is completely incapable of working at a job Plaintiff labeled as clerical in nature and not high in stress.

Similarly, Dr. Feilbelman opined Plaintiff's depression rendered her incapable of working, but reported a GAF score indicating some mild symptoms.

Nor did the letters submitted by Ms. Rohbeck or Dr. Feibelman during MetLife's appeal process modify or otherwise rehabilitate their earlier inconsistencies as neither reported new or worsened impairments.  Cf. Kinser v. Plans Admin. Comm. of Citigroup, Inc., 488 F. Supp. 2d 1369 (M.D. Ga. 2007) (finding administrator's decision to be abuse of discretion where administrator myopically relied on one inconsistent GAF score despite plaintiff's treating physician throughly explaining the inconsistency as a manic episode.).

Finally, it was not an abuse of discretion for the Defendant to rely upon the opinion of two IPCs.  "It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records," Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) and therefore "plan administrators are not required to give special deference to the opinions of treating physicians." Id. at 1358-59 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825, 123 S. Ct. 1965 (2003)).  Dr. Brown's conclusion, which was not rebutted on appeal, was that any impairment would be based strictly on a psychiatric diagnosis.  As Dr. Givens noted, from a psychiatric diagnosis, there were no specific functional impairments described by Plaintiff's treating physicians and no objective evidence to support significant impairment that would prevent Plaintiff from performing her occupational duties.

This Court recognizes that many psychological disabilities, such as bipolar disorder and depression, do not lend themselves to traditional notions of

objective evidence, but rather are often inherently subjective to the claimant. See Kinser, 488 F. Supp.2d at 1381 ("[P]sychiatric conditions such as [p]laintiff's are not easily proven by purely "objective" measures. Bipolar disorder is diagnosed and treated based on the patient's self-reported symptoms."); see also Oliver v. Coca Cola Co., 497 F.3d 1181, 1196-97 (11th Cir. 2007), *vacated on other grounds*, 506 F.3d 1316 (11th Cir. 2007). However, in this case, the determinations of Plaintiff's treating physicians were neither consistent nor reliant upon specific functional impairments. Cf. Kinser, 488 F. Supp. 2d at 1382-83 (finding that plaintiff's treating physician sufficiently explained the variation in assigned GAF scores); Fitts v. Unum Life. Ins. Co. of Am., No. 98-00617 2007 WL 1334974 (D.D.C. May 7, 2007) (finding administrators denial of disability benefits an abuse of discretion where the plaintiff's treating physicians made their determination on, among other factors, plaintiff's documented memory loss and lower IQ stemming fro bipolar disorder.). Therefore, the Court finds that Defendant's decision to deny Plaintiff LTD benefits was not an abuse of discretion.[6]

## III. CONCLUSION

In conclusion, the Court emphasizes that it neither questions the veracity of

---

[6] Defendant may have acted under a conflict of interest by acting as both the insurer and the decision-maker, but that one factor is not enough to convince this Court that its decision should be reversed as unreasonable.

Plaintiff's diagnoses of bipolar disorder, severe depression, or hepatitis C, nor is indifferent to their concomitant symptoms.  Furthermore, the Court's finding is not a stamp of approval indicating the Defendant's decision to be correct.  Rather, this Court only finds that, in light of the evidence before Defendant at the time the final determination was rendered, Defendant's decision to deny Plaintiff's LTD benefits was not an abuse of discretion.  As explained by another district court, "an abuse of discretion or arbitrary and capricious standard means that the reviewing court will affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision maker." Callough v. E.I. du Pont de Nemours & Co., 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996). According, Defendant's denial of LTD benefits to Plaintiff is **AFFIRMED**.

**SO ORDERED**, this the 18th day of August, 2009.

*s/   Hugh Lawson*
**HUGH LAWSON, Judge**

wjc